# Use of the Exchange Stabilization Fund to Provide Loans and Credits to Mexico

As part of an international financial support package for Mexico, the President and the Treasury Secretary have the authority under section 10(a) of the Gold Reserve Act of 1934 to use the Treasury Department's Exchange Stabilization Fund to provide loans and credits to Mexico in the form of (i) short-term currency "swaps" through which Mexico will borrow U.S. dollars in exchange for Mexican pesos for ninety days; (ii) medium-term currency swaps through which Mexico will borrow U.S. dollars for up to five years; and (iii) guaranties through which the United States will backup Mexico's obligations on government securities for up to ten years.

March 2, 1995

MEMORANDUM OPINION FOR THE GENERAL COUNSEL
DEPARTMENT OF THE TREASURY

On January 31, 1995, the President proposed to use the Treasury Department's Exchange Stabilization Fund ("ESF" or "fund") to provide $20 billion in loans and credits to Mexico as part of a financial support package for that country (the "support package"). On February 21, 1995, the Treasury Secretary ("Secretary") signed a series of agreements with the Mexican government implementing the support package. Prior to the execution of the agreements, we orally advised your office that, in our view, the President and the Secretary could use the ESF in the manner contemplated by the President when he proposed the support package. We also provided comments on drafts of a legal opinion, prepared by your office for the Secretary, regarding such use of the ESF. This memorandum confirms the oral advice we provided to your office. It also confirms that we have reviewed the final version of your legal opinion, and that we concur in your conclusion that the President and the Secretary have the authority to use the ESF in connection with the support package. We would like to take this opportunity to set forth briefly the basis for our determination that your conclusion is correct.

## I. Background

### A. *The Support Package*

Under the support package,[1] the loans and credits to Mexico from the ESF will take three forms: (i) short-term currency "swaps" through which Mexico

---

[1] Our understanding of the support package is derived from the following sources. (i) public information released by the Treasury Department when the President proposed the support package on January 31, 1995; (ii) the Secretary's testimony on the support package at a February 9, 1995 hearing before the House Committee on Banking and Financial Services, *see United States and International Response to the Mexican Financial Crisis: Hearings Before the House Comm. on Banking and Financial Services*, 104th Cong. 92–97 (1995) ("1995 Hearings"); (iii) public

Continued

83

will borrow U.S. dollars in exchange for Mexican pesos for ninety days; (ii) medium-term currency swaps through which Mexico will borrow U.S. dollars for up to five years; and (iii) guaranties through which the United States will backup Mexico's obligations on government securities for up to ten years. The ESF loans and credits will supplement billions of dollars in financial assistance that will be provided to Mexico by the International Monetary Fund ("IMF") and other lenders. As a whole, the support package is intended to help Mexico resolve its serious economic problems, which, in turn, have resulted in a significant destabilization of the Mexican peso and have threatened to disrupt the international currency exchange system.

## B. *The ESF*

The ESF was established by Congress in 1934 pursuant to section 10(a) of the Gold Reserve Act, which is now codified at 31 U.S.C. § 5302. The ESF "is under the exclusive control of the Secretary," whose use of the fund is "[s]ubject to approval by the President." *Id.* § 5302(a)(2). Initially, the statute provided that the ESF was to be used "[f]or the purpose of stabilizing the exchange value of the dollar." Act of Jan. 30, 1934, ch. 6, § 10(a), 48 Stat. 337, 341.[2] That is no longer the case. The provision governing the Secretary's use of the ESF now states:

> Consistent with the obligations of the Government in the International Monetary Fund on orderly exchange arrangements and a stable system of exchange rates, the Secretary or an agency designated by the Secretary, with the approval of the President, may deal in gold, foreign exchange, and other instruments of credit and securities the Secretary considers necessary. However, a loan or credit to a foreign entity or government of a foreign country may be made for more than 6 months in any 12-month period only if the President gives Congress a written statement that unique or emergency circumstances require the loan or credit be for more than 6 months.

31 U.S.C. § 5302(b).

The first sentence of the current provision stems from 1976 amendments to section 10(a) of the Gold Reserve Act. Those amendments eliminated the requirement that the ESF be used "for the purpose of stabilizing the exchange value of the dollar," and provided instead that the fund was to be used consistent with

information released by the Treasury Department when the Secretary signed the agreements implementing the support package on February 21, 1995; and (iv) your legal opinion for the Secretary.

[2] *See also* H.R. Rep. No. 73–292, at 2 (1934).

U.S. obligations in the IMF. *See* Bretton Woods Agreements Act Amendments, Pub. L. No. 94–564, 90 Stat. 2660, 2661 (1976).[3] The second sentence of the current provision stems from a 1977 amendment to section 10(a) of the Gold Reserve Act. *See* Act of Oct. 28, 1977, Pub. L. No. 95–147, 91 Stat. 1227, 1229.[4] The intention of that amendment was to ensure that longer-term lending from the ESF was limited to "unique or exigent circumstances."[5]

## II. Statutory Analysis

In carrying out the support package, the Secretary will be "deal[ing] in gold, foreign exchange, and other instruments of credit and securities" within the meaning of 31 U.S.C. § 5302.[6] The first question in the statutory analysis is whether use of the ESF in connection with the support package is "[c]onsistent with the obligations of the Government in the International Monetary Fund on orderly exchange arrangements and a stable system of exchange rates." *Id.* § 5302(b). We believe that it is. Again, the stated purpose of the support package is to stabilize the value of the Mexican peso and prevent disruption of international currency exchange arrangements — which is entirely in keeping with U.S. obligations in the IMF.[7] Moreover, since the statute states that the Secretary may use the ESF as he "considers necessary," it is up to the Secretary (subject to the President's approval) to decide when such action is consistent with U.S. obligations in the IMF. The Secretary's decisions in that regard "are final." *Id.*

---

[3] The 1976 amendments to section 10(a) of the Gold Reserve Act were part of a law that modified the Bretton Woods Agreements Act — the statute that implements U.S. obligations in the IMF. Congress concluded that those modifications were necessary because of an early 1970s shift in international monetary arrangements from fixed to variable currency exchange rates. As a result of that shift, the United States was not, in 1976, pursuing a policy "to stabilize the exchange value of the dollar at any par value, or fixed rate." H.R. Rep. No. 94-1284, at 13–14 (1976). Rather, its policy was "to permit a wide degree of fluctuation for the exchange value of the dollar, and to conduct exchange rate policy subject only to [its] obligations" in the IMF. *Id.* at 14. The modifications to the Bretton Woods Agreements Act authorized the U.S. to "accept amendments to the IMF Articles of Agreement . . . [that] permitted [members] to choose any . . . exchange arrangement, fixed or floating, subject to a general obligation to avoid exchange rate manipulation, promote orderly economic, financial, and monetary conditions, and foster orderly economic growth with reasonable price stability." S. Rep. No. 94-1295, at 2-3 (1976) ("1976 Senate Banking Comm. Report") When the ESF statute was first drafted, the dollar was pegged to a fixed rate. Therefore, a change to the statute that corresponded with changes in U.S. and international monetary policy was required. Simply put, the original language from 1934 specifying that the ESF was to be used to stabilize the dollar had become "anachronistic" by 1976 H R. Rep. No. 94-1284, at 14.

[4] The amendment was originally proposed in the Senate as part of the 1976 amendments to section 10(a). *See* 1976 Senate Banking Comm. Report at 11; *see also* 123 Cong. Rec. 33,219-20 (1977) (statement of Sen. Helms) (introducing amendment requiring that the President notify Congress of any use of the ESF for loans of greater than six months, and commenting that the amendment had been proposed in connection with Senate consideration of the 1976 amendments).

[5] 1976 Senate Banking Comm. Report at 11.

[6] The short- and medium-term swap arrangements are loans, in that Mexico will borrow dollars from the United States in exchange for pesos. The guaranties of Mexico's government securities obligations essentially serve as a line of credit from the United States on which Mexico can draw in the event that it cannot satisfy those obligations.

[7] As your legal opinion for the Secretary notes, Article IV of the IMF Articles of Agreement requires the United States to "collaborate with the [IMF] and other members to assure orderly exchange arrangements and to promote a stable system of exchange rates." Members are to fulfill that obligation "by fostering orderly underlying economic and financial conditions and a monetary system that does not tend to produce erratic disruptions." *See also supra* note 3 (discussing 1976 modifications to federal statute that implements U.S. obligations in the IMF).

§ 5302(a)(2). In short, in implementing the support package, the Secretary has exercised the discretion that Congress has vested in him.[8]

The plain language of the statute also provides the President and the Secretary with the legal authority to use the ESF for the currency swaps of up to five years and the guaranties of up to ten years. The statute explicitly states that loans or credits with repayment terms of more than six months can be extended from the ESF "if the President gives Congress a written statement that unique or emergency circumstances require the loan or credit be for more than 6 months." *Id.* § 5302(b). When the support package was proposed on January 31, 1995, the President announced that he had determined that the financial crisis in Mexico constituted unique and emergency circumstances.[9] The President made his announcement in a joint statement that he issued with the congressional leadership, who expressed their collective view that the use of the ESF in connection with the support package was both lawful and necessary.[10]

The authority of the President and the Secretary to use the ESF as a source of loans or credits of more than six months has been invoked once before in the years since the statute was amended in 1977 to provide expressly for such action. That came in 1982, when President Reagan, acting in response to an earlier instance of financial turmoil in Mexico, turned to the ESF to provide loans to Mexico with maturities of up to one year. In accordance with the statutory requirements, President Reagan notified Congress in writing on September 8, 1982, that

---

[8] At the February 9, 1995 hearing on the support package that was held by the House Banking and Financial Services Committee, Representative Barr suggested that, when considering possible financial assistance to Poland in 1989, the Treasury Department had concluded that it was unlawful to use the ESF for purposes other than to stabilize the dollar. 1995 Hearings at 131. Any such conclusion would have contravened the express terms of the ESF statute. In any event, that is *not* what Treasury concluded in that case. Rather, Treasury said that it would not be "improper or illegal" to use the ESF to extend a "bridge loan" to Poland if the Secretary "concluded that such a loan would be consistent with U.S. obligations in the IMF and was necessary." *United States Economic Programs for Poland and Hungary: Hearings and Markup on H.R. 3402 Before the House Comm. on Foreign Affairs,* 101st Cong. 175 (1989) ("1989 Hearings"). Treasury determined that, in the particular circumstances of that case, "it [was] highly unlikely that such a conclusion could be justified." *Id.* Moreover, in the absence of a commitment from the IMF, Poland had no means of guaranteeing repayment of any ESF loan. In Treasury's view, the use of the ESF in such circumstances would be "much closer to foreign aid." *Id.* at 149 (statement of William E. Barreda, Deputy Assistant Secretary for Trade and Investment Policy); *see also id.* at 162–63. Therefore, Treasury decided to seek legislative authorization for assistance to Poland. *Id.* at 148–49 (statement of Mr. Barreda). Here, by contrast, the IMF is playing an integral role in the support package, and the ESF loans and credits will have an assured source of repayment. *See* discussion *infra* note 12.

[9] It is our understanding that the President will promptly provide Congress with written notice of that determination, as required by the ESF statute.

[10] In pertinent part, the joint statement was as follows:

> We agree that, in order to ensure orderly exchange arrangements and a stable system of exchange rates, the United States should immediately use the Exchange Stabilization Fund (ESF) to provide appropriate financial assistance for Mexico. We further agree that under Title 31 of the United States Code, Section 5302, the President has full authority to provide this assistance. Because the situation in Mexico raises unique and emergency circumstances, the required assistance to be extended will be available for a period of more than 6 months in any 12-month period . . . . We must act now in order to protect American jobs, prevent an increase flow of illegal immigrants across our borders, ensure stability in this hemisphere, and encourage reform in emerging markets around the world. This is an important undertaking, and we believe that the risks of inaction vastly exceed any risks associated with this action. We fully support this effort, and we will work to ensure that its purposes are met.

Statement With Congressional Leaders on Financial Assistance to Mexico, 1 Pub. Papers of William J. Clinton 130 (1995).

he had determined on August 24, 1982, that unique and exigent circumstances required that the ESF loan to Mexico have repayment terms in excess of six months.[11] It is true that no prior precedents under the ESF involved loans or credits of maturity lengths and dollar amounts comparable to those at issue in the support package.[12] That said, such use of the ESF is clearly authorized by the language of the statute.

We find it telling that when Congress was considering what eventually became the 1977 amendment to section 10(a) of the Gold Reserve Act, it apparently gave some thought to restricting use of the ESF to short-term lending exclusively so that the ESF would not compete with the IMF — which was seen as the primary vehicle for longer-term lending. In fact, a question to that effect was posed to a Treasury Department official during the course of a Senate Banking Committee hearing that explored, among other things, the relationship between lending under the ESF and lending under the IMF.[13] In response, the Treasury official stated:

> [A] statutory requirement that [the ESF] be used for short-term lending exclusively would not be appropriate and would unnecessarily impair U.S. flexibility, especially in unforeseen circumstances, in implementing our international monetary policy . . . . [I]t is conceivable that, in some instances, use of the ESF for a somewhat more extended period may be necessary. External factors (such as natural disasters, trade embargoes, unforeseen economic developments . . .) may lead a country which has obtained a short-term credit from the ESF to seek an extension of that credit. It is also conceivable that political assassination or other unanticipated catastrophic event might justify a longer extension of credit, and the possibility of ESF operations in such cases should not be excluded. In none of these cases would the ESF compete with the IMF, and in all of these cases it well may be in the U.S. interests to provide somewhat more extended ESF financing.[14]

That sentiment carried the day, and ultimately found its way into the statute through the 1977 amendment. The report of the Senate Banking Committee on what turned out to be that amendment puts its succinctly:

---

[11] *See* Letter for Thomas P. O'Neill, Jr., Speaker of the House of Representatives, from President Ronald Reagan (Sept. 8, 1982), *reprinted in* 1989 Hearings at 161–62.

[12] It is our understanding, however, that other critical elements of the loans and credits to Mexico in connection with the support package — in particular, the structure of the agreements and the existence of an assured source of repayment — are fully consistent with past practice under the ESF.

[13] *Amendments of the Bretton Woods Agreements Act: Hearing Before the Subcomm. on International Finance of the Senate Comm. on Banking, Housing and Urban Affairs*, 94th Cong. 157 (1976).

[14] *Id.* at 158 (statement of Edwin H. Yeo, III, Under Secretary for Monetary Affairs, Department of the Treasury).

The Committee recognizes that there may be circumstances where longer-term ESF credits may be necessary, and the amendment provides for that possibility. But the Committee intends, and the amendment expressly provides, that such longer-term financing be provided only where there are unique or exigent circumstances. As indicated by Treasury, these would include natural disasters, trade embargoes, unforeseen economic developments abroad, political assassinations, or other catastrophic events. In none of these cases should the ESF compete with the IMF, however, and every effort should be made to bring all medium and longer-term financing within the framework of the IMF or other appropriate multi-lateral facilities.[15]

The Mexican economic crisis would appear to be a prime example of the type of unique or exigent circumstances that the Senate Banking Committee had in mind when crafting the 1977 amendment: according to some observers, Mexico's financial troubles were exacerbated by the shocking assassinations in 1994 of two key Mexican political leaders and the unanticipated strife in the Chiapas region of Mexico.[16] Furthermore, the support package appears to honor the Committee's admonition that longer-term use of the ESF not "compete" with the IMF. It is our understanding that the loans and credits from the ESF complement the substantial financial assistance that the IMF and other lenders are furnishing to Mexico. Indeed, the Treasury Department has worked closely with the IMF in fashioning the support package.

Finally, it is worth noting that Congress plays an important oversight role with respect to use by the President and the Secretary of the ESF for loans of more than six months. As the Senate Banking Committee described Congress's function, "[t]he requirement that the President report to the Congress on any such longer-term financing will provide the Congress with an opportunity to scrutinize such longer-term ESF credits and take appropriate steps to insure that they are consistent with U.S. interests and U.S. obligations under the IMF." [17] In that role, Congress has, over the years, considered various proposals to cabin the authority of the President and the Secretary under the ESF statute. Those proposals have

---

[15] 1976 Senate Banking Comm. Report at 11 (footnote omitted). The Committee echoed that theme elsewhere in the report:

[The] amendment would not bar the United States from making longer-term credits to foreign countries for exchange market intervention, but it would insure that such longer-term credits are not extended unless the President finds that unique or exigent circumstances exist, such as the unavailability of IMF or other international financial resources for that purpose. By helping to keep ESF financing short-term in nature, the amendment would help insure consistency between use of the ESF and U.S. obligations as a member of the IMF. *Id.* at 17-18.

[16] *See* Henry A. Kissinger, *Aiding Mexico is Not Just Economics—It's National Security,* L.A. Times, Jan. 29, 1995, at M2; Tod Robberson, *Mexico's Meltdown,* Wash. Post, Jan. 8, 1995, at A24; *see also* Time, Jan. 9, 1995, at 44.

[17] Senate Banking Comm. Report at 11.

been repeatedly rejected, however.[18] This history reflects the judgment of Congress that the President and the Secretary should retain the flexibility to use the ESF, as they consider necessary, to respond promptly to sudden and unexpected international financial crises that undermine the global currency exchange system and jeopardize vital U.S. economic interests.[19]

WALTER DELLINGER
*Assistant Attorney General*
*Office of Legal Counsel*

---

[18] For example, in 1984, then-Representative (and now Senator) Brown introduced legislation that he said was designed to restore the ESF to its original purpose, and thereby prevent the ESF from being used as a "slush fund to bail out American banks" that make bad loans abroad. *See Exchange Stabilization Fund and Argentina: Hearings Before the Subcomm. on International Trade Investment and Monetary Policy of the House Comm. on Banking, Finance and Urban Affairs*, 98th Cong. 129 (1984) (statement of Rep. Brown). Other members of the House took issue with the premises underlying Representative Brown's proposal. *See id.* at 135–36 (statement of Rep. Neal); *id.* at 138–39 (statement of Rep. Leach); *id.* at 156–57 (statement of Rep. Barnard). In the end, Congress did not act on the proposal. Similarly, in 1990, a House Committee held a hearing that was intended, among other things, to probe whether the ESF had been used "to circumvent the appropriations process" through which financial assistance to foreign countries is normally tendered. *See Review of Treasury Department's Conduct of International Financial Policy: Hearing Before the House Comm. on Banking, Finance and Urban Affairs*, 101st Cong. 2 (1990) (statement of Rep. Gonzalez) ("1990 Hearings"). There too, the hearing produced no changes to the authority of the President and the Secretary under the ESF statute.

[19] As a senior Treasury Department official in the Reagan and Bush Administrations articulated the issue:

Globalization of the world economy and financial markets has changed the nature and scope of strains on the balance of payments adjustment process. There is more latitude for exchange rates to fluctuate, and indebtedness problems have arisen with serious implications for world financial markets. The ESF . . . is the U.S. Government's only instrument providing the means for a rapid and flexible response to international financial disruption which can impact adversely on the U.S. economy. The ESF provides a powerful and flexible means for the Secretary of the Treasury, with the approval of the President, to support our obligations in the IMF, especially those concerning orderly exchange arrangements and a stable system of exchange rates.

1990 Hearings at 4 (statement of David C. Mulford, Under Secretary for International Affairs).